IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CARLTON CAINION, )
)
Plaintiff, )
)
v. ) CASE NO. 1:14-cv-574-TFM
) [wo]
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**

Carlton Cainion ("Plaintiff" or "Cainion") applied for supplemental security income under Title XVI and disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act") in November of 2010, alleging that he became disabled on April 29, 2006 (Tr. 129). After being denied, Cainion timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on November 23, 2012. (Tr. 15-28). Cainion subsequently petitioned for review to the Appeals Council who rejected review of Cainion's case. (Tr. 1-8). As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court affirms the Commissioner's decision.

## I. NATURE OF THE CASE

Cainion seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits. United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The Court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id*.; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

## III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[1] *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2] Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues. *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment(s) severe?
>
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert (VE). *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id*.

## IV. ADMINISTRATIVE FINDINGS AND CONCLUSIONS

On November 4, 2010, Cainion filed for disability commencing April 29, 2006 resulting from an electrocution accident which occurred while he was working as a track inspector when he touched an electrified rail and was knocked unconscious. (Tr. 22, 38, 429). On November 23, 2012, the ALJ issued an opinion finding that Cainion has severe

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

impairments including cervical spondylosis, lumbar degenerative disc disease, scoliosis, degenerative joint disease of the left shoulder, hypertension, headaches, right eye blindness, depression, personality disorder, organic mental disorder (drug and alcohol related) and drug and alcohol abuse. (Tr. 17-18). Cainion was born on April 20, 1960 (Tr. 303) and took some college classes. (Tr. 39). The ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform." (Tr. 27).

## V. FACTS

Cainion has sought medical treatment on many occasions for psychiatric related issues. On February 8, 2008, Plaintiff was admitted to Southwestern State Hospital in Georgia and was diagnosed with schizoaffective disorder, polysubstance disorder, post traumatic stress disorder, and liver disease. He was discharged on February 29, 2008. His discharge orders included a referral to the Gateway program. (Tr. 301-07; 334-41). He was admitted again to the Southwestern State Hospital on March 21, 2008 after personnel in the Gateway program noted his deterioration over time. He was diagnosed with polysubstance dependence, (alcohol and cocaine); personality disorder, not otherwise specified; with antisocial traits and hypertension. He was discharged on March 24, 2008. (Tr. 308-29).

On November 19, 2010, Dr. Moore at Southwestern State Hospital diagnosed Axis I: polysubstance dependence (alcohol and cocaine); major depressive disorder, moderate to severe, recurrent without psychotic features; Axis II: personality disorder, NOS, with antisocial traits; Axis III: Hypertension; Axis IV: chronic mental illness and social isolation;

AXIS V: modified global assessment of functioning of 25. (Tr. 345). The ALJ discredited this functioning assessment on the basis that Cainion received a subsequent rating of 40 by an unidentified mental health provider and "the longitudinal evidence" does not support these low scores. (Tr. 27). Indeed, medical providers repeatedly note that Cainion's intellect is "average" or "normal". (Tr. 292-98, 304, 309, 344, 380). However, consulting psychologist, Dr. J. Walter Jacobs, Ph.D noted upon evaluation of Canion that "[b]ased on claimant's educational and work history one would infer average intelligence. Based on the assessment of memory and cognition one would infer borderline intelligence." (Tr. 434).

The records further indicate that Cainion had previously been treated at Southwestern eight times for psychiatric related issues. (Tr. 343). At the hearing before the ALJ, Cainion testified that he has been clean and sober since November 2010 (Tr. 22), and thus the ALJ determined that his drug and alcohol abuse is not material, but the "residual functional capacity accommodates his severe impairments of drug and alcohol abuse and organic mental disorder related to drug and alcohol abuse." (Tr. 25). On December 2, 2010, Plaintiff was admitted to Gateway Dual Diagnosis Community Residential Program for treatment of polysubstance dependence (alcohol, crack cocaine); major depressive disorder; personality disorder NOS. Also severe isolation was noted and Cainion was assigned a GAF of 40. (Tr. 380-85).

On February 4, 2011, Cainion saw Dr. Sam R. Banner for a disability evaluation. (Tr. 426-30). Dr. Banner noted that Cainion complained of chronic headaches, dizziness and neck and back pain resulting from an electrocution accident in 1987. (Tr. 426). He noted

Cainion demonstrated no pain getting on and off the exam table, but did note pain in left knee with seated leg raising. (Tr. 428, 429). He noted that Cainion stated he had been diagnosed with bipolar disorder and mood disorder. He diagnosed the following: psychiatric disorder, history of electrocution in 1987, Hypertension, and loss of right eye due to trauma. He stated that "[c]laimant needs a psychiatric evaluation and long term medical care." (Tr. 429).

On February 15, 2011, Cainion saw Dr. Jacobs for a psychological evaluation. Dr. Jacobs noted that Cainion started having back problems, while working for MARTA in Atlanta, when he stepped on an electrified tract and was knocked unconscious. (Tr. 432). Dr. Jacobs diagnosed Axis I: polysubstance dependence (alcohol, cocaine), early remission; major depression, recurrent moderate; Axis II: personality disorder, NOS, cluster B features; borderline intellectual functioning. He opined that "[g]iven Mr. Cainion's history he would be at high risk for relapse." (Tr. 432-35).

On June 30, 2011, Cainion was treated at the emergency room of the Southeast Alabama Medical Center, was diagnosed with depression and was given medication refills for his Trazadone, Celexa and Buspar prescriptions. (Tr. 509-21). On August 19, 2011, he returned to at Southeast Alabama Medical Center for back and neck pain, and "advanced chronic degenerative changes [of the] cervical spine" were noted, but no "acute abnormality" was noted in the "cervical spine or thoracic spine." Cainion was again treated at Southeast Alabama Medical Center emergency room on September 26, 2011. He stated that he was "hearing voices" and this started when he was "out of medications." The emergency room notes state "[t]he patient complains of depression, agitated, hallucinating. Symptoms

associated with psych complaint are depressed, paranoia, agitated, anxious, headache." (Tr. 545-48). Records from SpectraCare Health Systems indicate Cainion was seen multiple times from May 24, 2011 through June 13, 2012 for addiction and psychiatric related issues including Major Depressive DO, Recurrent, Moderate, Schizophrenia Paranoid Type and Personality Disorder NOS. (Tr. 566-95).

The ALJ evaluated the opinion evidence of record and specifically stated the weight she gave to each consultant's opinion and discussed her reasons for discounting portions of these opinions. (Tr. 26-27). Specifically, the ALJ stated that she gave "some weight" to the psychological consultant's psychiatric review technique assessment. (Tr. 444-57). Indeed, she gave "substantial weight" to the opinion that Cainion has "moderate restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties with regard to concentration, persistence, or pace." (Tr. 26). Based upon her review of the medical records, the ALJ gave "no weight" to the opinion that Cainion "experienced one or two episodes of decomposition, which have been of extended duration." (Tr. 26).

Additionally, the ALJ gave "some weight" to the state agency psychological consultant's mental residual functional capacity (Tr. 458-61), and specifically gave "substantial weight" to her opinion that Cainion is capable of performing "unskilled work," but is limited to "infrequent contact" with the public, and to concentrating for more than two hours. (Tr. 26). However, based upon her review of the evidence, the ALJ gave "no weight" to the opinion that Cainion's mental health issues will probably cause him to miss "one or two days of work a month". (Tr. 26).

Additionally, the ALJ gave "some weight" to the State agency medical consultant's physical assessment stating that Cainion "is limited to a range of light work." (Tr. 472-479). Again the ALJ gave "substantial weight" to certain parts of that opinion, but "no weight" to other parts. Specifically, based upon her review of the record, the ALJ credited the opinion that Cainion "can frequently balance, stoop, kneel, and crouch" . . . "never climb ladders, ropes, or scaffolds" . . . "avoid concentrated exposure to temperature extremes" . . . "avoid hazards." However, because the ALJ found the evidence conflicting, she totally discredited the part of the opinion limiting Cainion to "lifting and carrying 20 pounds occasionally . . . 10 pounds frequently . . . and perform no overhead reaching with the left upper extremity." (Tr. 26).

At the hearing before the ALJ, Cainion testified that he was in "pain all the time" and because he had no insurance and no means of getting medical help he drank to help cope with the pain. (Tr. 40). He explained that in the past he self-medicated with alcohol and drugs, but that now he was in therapy and taking medicine and going to support meetings regularly. (Tr. 43-44). Cainion explained that he has been through rehab three times, but denied any drug use since December 2010. (Tr. 48).

Cainion testified that he has continuous problems with his back, neck and legs and rated the pain in his legs as an eight on a scale of zero to ten, where zero is no pain and ten is intolerable. (Tr. 45). Cainion testified that he could lift and carry approximately eight pounds, he could sit, stand and walk for approximately five minutes. (Tr. 50). He reported that "it's difficult for me to even bend sometimes to pick up anything." (Tr. 50). Moreover,

he testified that there has been a decline in his ability to read and write, since his on-the-job injury, which further erodes his abilities to do any kind of job. (Tr. 55).

On his Adult Function Report dated December 10, 2010, which his sister completed for him, Cainion reports that prior to his on the job injury he "was able to do everything for myself, work, cook, clean, take care of family." (Tr. 189). He reports that after his on-the-job injury he "get[s] confused easily." (Tr. 184). However, he can still "dress [him]self," but does not "change a lot", can "feed [him]self", but does not "eat much." He also reports that he "walk[s] alone all of the time, but that his family takes . . . [him] everywhere else." (Tr. 182). Cainion reports that he "walk[s] to help my back feel better" and he does not drive because he "can't concentrate." (Tr. 182). However, he does go to the "corner store about 3 or 4 times a week" and to the "grocery store about once a week." (Tr. 182).

The vocational expert testified that if Cainion's testimony was fully credible, such that the claimant would not be able to sustain the necessary stamina to complete an eight-hour work day without the need for frequent rest breaks every hour; and would not be able to sustain concentration and attention for two-hour periods, that individual would not be able to perform any of his past work or any other work in the national or regional economy. (Tr. 61).

Cainion's sister, with whom he currently lives and who provides some care to him on a daily basis (Tr. 169, 179), states in the Third Party Adult Function Report dated November 20, 2010, that prior to his on-the-job injury, which occurred fifteen years ago, he could do everything for himself and that his wife and family left him after the accident "because of hostile behavior." (Tr. 170). She reports that now Cainion can bathe, dress, and shave

himself, but that he does not do these things on a "regular" basis and that he can also feed himself, but he "complains of no appetite" and "weighs very little." However, he can use the toilet by himself. (Tr. 170). She also reports that he "can do laundry, take out trash, try to make bed sometimes" but that he does not do these chores unless "forced" to do them and needs "guidance" when doing the house work. (Tr. 171-72). His family takes him to "important meetings or appointments"; he never goes "alone," but he takes long walks several times a week. (Tr. 172-74).

## VI. ISSUES

Cainion raises a single issue for this Court's consideration; that is whether the Commissioner erred as a matter of law in finding that Cainion can perform medium work. (Plaintiff's Brief at p.2).

## VII. ANALYSIS

Cainion argues that the ALJ erred when she concluded that he can perform medium work. Indeed, the vocational expert testified that if Cainion's testimony was fully credible, such that the claimant would not be able to complete an eight-hour work day without the need for frequent rest breaks every hour; and would not be able to sustain concentration and attention for two-hour periods, that individual would not be able to perform any work in the national or regional economy. (Tr. 61). However, the ALJ determined that Cainion had the residual functional capacity to "perform less than the full range of medium work". (Tr. 22). In making this finding, the ALJ specifically considered the credibility of Cainion's testimony

and concluded "the claimant's medically determinable impairments[5] could reasonably be expected to cause the alleged symptoms" but did not credit Cainion's testimony of the "intensity, persistence and limiting effects of these symptoms" such that he would be precluded from all work. (Tr. 23).

The law is well-settled; the ALJ retains discretion not to credit the claimant's testimony of pain and other symptoms. *See Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991). However, when the ALJ decides not to fully credit the claimant's testimony, the ALJ must articulate the reasons for that decision. *Id.* In other words, even where the medical record includes objective evidence of pain, and where the ALJ acknowledges that the claimant experiences some pain, the ALJ may conclude that the degree of pain is not disabling in light of all the evidence. *See Macia v. Bowen*, 829 F. 2d 1009, 1011 (11th Cir. 1987). Indeed, it is not inconsistent for the ALJ to find a claimant suffers pain, and yet is not so severely impaired as to meet the stringent test for disability imposed by the Act. *See Arnold v. Heckler*, 732 F. 2d 881, 884 (11th Cir. 1984).

In her decision, the ALJ found that Plaintiff's subjective complaints were not consistent with his activities of daily living, objective medical evidence, and other evidence in the record and she fully explained her rationale. (Tr. 23-26). Indeed, the ALJ reviewed the medical evidence of record concerning Cainion's neck, back and shoulder pain, hypertension, headaches, right eye blindness (Tr. 23- 24) and his psychiatric issues including

[5] The ALJ concluded Cainion has severe impairments including cervical spondylosis, lumbar degenerative disc disease, scoliosis, degenerative joint disease of the left shoulder, hypertension, headaches, right eye blindness, depression, personality disorder, organic mental disorder (drug

severe depression, personality disorder and, organic mental disorder from drug and alcohol abuse. (Tr. 24-25). The ALJ also discussed in detail Cainion's activities of daily living, social functioning and concentration in which she found Cainion suffered "moderate" impairments. In so doing, the ALJ specifically set out Cainion's conflicting testimony and the conflicting record evidence as a whole. (Tr. 19-21). *See Arnold,* 732 F. 2d at 884 (affirming the ALJ's finding of no disability where no physician opined the claimant was disabled due to pain and the ALJ summarized medical evidence discounting the claimant's complaints of pain); *compare, with Kent v. Sullivan*, 788 F. Supp. 541, 544 (N.D. Ala. 1992) (holding the ALJ failed to fully explain her reasons for discrediting claimant's testimony and did not discuss "what there was in the medical evidence to indicate that pain could not be reasonably expected.")

In the instant case, the ALJ noted Cainion's testimony that he needs help caring for himself on a daily basis (Tr. 18, 49), but she recognized the Function Report, completed by Cainion with assistance of his sister, demonstrated that he can dress himself, feed himself, prepare simple meals, make his bed, take out the trash, as well other household chores. (Tr. 18-19, 179-181). Additionally, the ALJ noted the record evidence that Cainion reports he has problems getting along with others (Tr. 19, 184), but she also recognized that his sister reported in the Third Party Function Report that Cainion, spends time with others, visits family, and talks on the phone. (Tr. 19, 173). The ALJ also noted Cainion's non-compliance with medication. Furthermore, the ALJ stated the medical records confirmed Cainion's

---

and alcohol related) and drug and alcohol abuse. (Tr. 17-18).

"good physical and mental status". (Tr. 26, 293, 389-402, 426-429). *See Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) (Consideration of claimant's daily activities, symptom frequency, and medication types and dosages were sufficient reasons for finding plaintiff not credible.) Accordingly, the court concludes that the ALJ did not err in discrediting Cainion's testimony to the extent that it would prevent him from performing any work.

After conducting its own thorough and independent review of the record, the Court recognizes that there is evidence which does not fully support the ALJ's decision. *Foote*, 67 F.3d at 1560 (The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision). However, the law is clear; if the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison*, 355 F.3d at 1275. Based on an independent review of the record, the Court concludes that the ALJ's opinion is supported by substantial evidence.

## VII. CONCLUSION

Pursuant to the findings and conclusions detailed in the Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law. It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED**. A separate order shall accompany this opinion.

DONE this 1st day of July, 2015.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE